Barbara BROWN, Plaintiff,

v.

Patricia A. MCCORMICK,
et al., Defendants.

No. Civ. L–96–3450.

United States District Court,
D. Maryland.

March 7, 2000.

**468**

Johnny Meldon Howard, Houston and Howard, Washington, DC, for Plaintiff.

Vicki L. Dexter, Irwin, Green & Dexter, LLP, Baltimore, MD, Kathryn A. Young, Beverly Hills, CA, for Defendants.

### MEMORANDUM

LEGG, District Judge.

### Introduction

This is the opinion in a copyright infringement case that was tried before the Court, sitting without a jury. Because of the complexity of the facts, a brief summary is in order.

In 1994, Defendants, Universal City Studios, Inc. ("Universal Studios") and Amblin' Entertainment, Inc. ("Amblin"), were producing a motion picture entitled, *How to Make an American Quilt* ("the Movie"). Universal Studios hired Defendant Patricia McCormick as a technical consultant. One of McCormick's assignments was to obtain the quilts that were to be used as props. As stated in the contract between Universal and McCormick, any prop that McCormick obtained would be the property of Universal.

One of the quilts called for in the script was an African–American story quilt entitled, "The Life Before." The quilt was to comprise of a series of blocks, each of which would depict a chapter in the family history of one of the characters, including life in Africa, capture and transshipment, slavery, and emancipation. When the designs created by the studio art department proved unsatisfactory, McCormick contacted the plaintiff, Barbara Brown, a well-known professional quilter.

McCormick, on behalf of Universal, and Brown entered into a written agreement providing that Brown, in exchange for $750, would create patterns for fifteen blocks. The agreement contemplated that other quilters would select the fabrics and colors and provide the labor needed to translate Brown's designs into a completed quilt. The agreement stated that Brown would retain the copyrights to the patterns, but that Universal was authorized to create two prop quilts for the Movie.[1] Using Brown's designs, McCormick and another quilter named Dora Simmons fashioned "The Life Before" quilt displayed in the Movie.

The script called for another quilt, "Where Love Resides," whose sixteen blocks would depict the Movie's main pic-

---

1. As described herein, the agreement permitted Universal to make two copies of "The Life Before." The script required two copies of the same quilt: one was to be distressed to appear more than 100 years old, and one was to appear new.

torial themes. McCormick and Universal's production team designed the blocks, only one of which, the Marriage Block, is at issue in this litigation. In designing the Marriage Block, McCormick essentially copied, although in a somewhat altered form, a block (the Wedding Block) that Brown had created for "The Life Before" quilt.

In this lawsuit, Brown does not contend that displaying "The Life Before" in the Movie violates the contract between herself and McCormick. Brown does, however, complain of the following ancillary displays of the quilt:

(i) McCormick's display of "The Life Before" at quilting exhibitions;

(ii) pictures of "The Life Before" in a tie-in book entitled, *Where Love Resides;* and

(iii) McCormick's display of "The Life Before" on cable television programs.

Brown objects to all displays of "Where Love Resides" because the quilt includes the derivative Wedding Block. Thus, her suit complains of the following:

(i) display of "Where Love Resides" in the Movie;

(ii) a rendering of "Where Love Resides" on t-shirts and tote bags promoting the Movie;

(iii) display of "Where Love Resides" in the tie-in book, *Where Love Resides;*

(iv) a rendering of "Where Love Resides" in a painting by Defendant John Simpkins and in prints of the painting; and

(v) McCormick's display of "Where Love Resides" on cable television programs.

This case was vigorously litigated. The lawsuit was filed on November 1, 1996. Following extensive discovery and the filing of an amended complaint, the parties filed cross-motions for summary judgment, which the Court granted in part and denied in part on October 8, 1998. *See*

*Brown v. McCormick,* 23 F.Supp.2d 594 (D.Md.1998).

Following summary judgment, sixteen counts of alleged copyright infringement remained in the case.[2] The sixteen counts can be divided into seven groups:

(i) claims solely against McCormick for copying the Wedding Block to create the Marriage Block (Counts I–II);

(ii) claims solely against McCormick for displaying "The Life Before" and "Where Love Resides" quilts at exhibitions (Count III);

(iii) claims relating to the display of "Where Love Resides" on promotional items, specifically t-shirts and tote bags (Counts IX–X);

(iv) claims relating to the *Where Love Resides* book featuring the quilts used in the Movie (Counts XI–XIV);

(v) claims relating to an art print painted by Defendant John Simpkins (Count XVI–XIX);

(vi) claims against McCormick for the unauthorized display of the two quilts on two cable television shows (Count XX); and

(vii) claims that the display of the Marriage Block in the Movie itself infringes Brown's copyright (Count XXIV–XXV).

The parties participated in a settlement conference with a Magistrate Judge in April 1999, but were unable to resolve the case. Accordingly, the case came before this Court for a five-day bench trial beginning May 24, 1999. Final arguments were held on July 2 and July 19, 1999.

Briefly stated, the Court finds that McCormick infringed Brown's copyrighted Wedding Block. Accordingly, all displays of the Marriage Block are infringing. This includes the display of the "Where Love Resides" quilt in the Movie, in the t-shirts and tote bags promoting the Movie, and in the tie-in book, *Where Love Resides.* Further, McCormick was not entitled to dis-

---

**2.** The amended complaint contains 25 counts. Six counts were dismissed at summary judgment and three were voluntarily dismissed by Brown after reaching a settlement with two defendants who were only tangentially involved.

play the "Where Love Resides" quilt on television or at quilt shows. The John Simpkins fine art print, however, does not infringe Brown's copyright. The "Where Love Resides" quilt as it appears in the print is rendered suggestively and with insufficient detail to infringe. With respect to "The Life Before" quilt, the Court finds that the defendants were entitled to display it in the Movie, but not on television, at quilt shows, or in the tie-in book.

The Court concludes that none of the defendants' infringements were willful. Moreover, the substantial damages sought by Brown are not supported by the evidence, including Brown's requests for injunctive relief and award of attorneys' fees. By separate Order, the Court shall, however, award Brown

(i) actual damages against McCormick in the amount of $50;

(ii) actual damages against Amblin in the amount of $2.35;

(iii) statutory damages against McCormick in the amount of $ 7,000; and

(iv) statutory damages against Universal, M & FM, and Patchwork in the amount of $ 7,000.

Having heard the testimony of the witnesses and the oral arguments of counsel, and having reviewed and considered the exhibits submitted at trial, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### The Parties

1. Plaintiff Barbara Brown is a professional quilt maker and designer who is a resident of the State of Maryland. Brown conducts her quilt business in Odenton, Maryland under the name "The Quilt Connection."

2. Defendant Patricia A. McCormick is a quilter and quilt book author who is a resident of the State of California.

3. Defendant Amblin' Entertainment, Inc. ("Amblin") is a Delaware corporation, with its principal place of business in Universal City, California. Amblin produces motion pictures for distribution and viewing in movie theaters and on television throughout the United States, including the State of Maryland.

4. Defendant Universal City Studios, Inc. ("Universal Studios") is a Delaware corporation, with its principal place of business in Universal City, California. Universal Studios produces motion pictures and television films for distribution and viewing throughout the United States, including the State of Maryland.

5. Defendant MCA/Universal Merchandising, Inc. (now known as Universal Studios Consumer Products, Inc., and referred to here as "Universal Merchandising") is a California corporation, with its principal place of business in Universal City, California.

6. Defendant Marketing and Financial Management Enterprises, Inc. ("M & FM") is a California corporation, with its principal place of business in Woodland Hills, California.

7. Defendant That Patchwork Place, Inc., (now known as Martingale & Co., Inc., and referred to here as "Patchwork") is a Washington corporation, with its principal place of business in Woodinville, Washington. Patchwork is a quilt book publisher that distributes and sells its quilt books in quilt shops and bookstores throughout the United States, including the State of Maryland.

8. Defendant The Greenwich Workshop, Inc. ("Greenwich") is a Connecticut corporation, with its principal place of business in Shelton, Connecticut. Greenwich distributes and sells its art prints in art and gift shops throughout the United States and has authorized dealers located in the State of Maryland.

9. Defendant John Simpkins is a contemporary folk artist and a resident of the state of Oregon.

### Beginning of the Movie Project

10. In June 1994, Universal Studios and Amblin began the production and film-

ing of the motion picture *How to Make an American Quilt.*

11. The Movie was based on a 1991 Whitney Otto novel of the same name. The plot centers on a young woman, Finn, who spends a summer living in a small California town with her grandmother and great aunt. The visit gives Finn time and space to finish her Master's thesis and also debate her impending marriage. Finn encounters the women in her grandmother's quilting circle, who are sewing a quilt for Finn as a wedding present. The women reminisce about men, love, and marriage, and the film, primarily through flashbacks, tells the story of each. The wedding quilt, "Where Love Resides," is a unifying plot device because each of the women sews into the quilt a block depicting her own story.

12. As McCormick would later relate in her behind-the-scenes book, *Pieces of an American Quilt:* "[t]he original script called for five quilts, but gave very little description of what they were to look like." (Def.Ex. 43, Patty McCormick, *Pieces of an American Quilt* 11 (1996).) McCormick hired several other quilters ("the nonparty quilters") to create the patterns for three of the movie quilts, Marianna's Baby Quilt, the Grasse Quilting Bee Quilt, and the Crazy Quilt. The contracts between the nonparty quilters and McCormick provide more detailed instructions than the contract with Brown, and do not give copyrights to the nonparty quilters. (*See* Pl.Ex. 13–16.) The final two quilts are at issue in this case.

13. The first is an "African–American story quilt" entitled "The Life Before." One of the characters, Anna, had inherited this quilt as a family heirloom. The movie script (again, based on Otto's novel) described "The Life Before" as

laid out in fifteen squares which are filled with scenes in native, appliqued form. We see angels blowing trumpets, blazing suns, Adam and Eve and the snake, elephants and giraffes, African warriors doing battle, men and women in chains inside a ship on a choppy sea

... a scene with a black bird flying over a man and a woman holding hands. (Def.Ex. 2 at 2.)

14. The Court had the pleasure of viewing the quilts created by Ms. Brown and the other quilters who worked on the Movie. The quilts are impressive in design and execution.

15. The script describes a "folk-art" style similar to the renowned "Bible Quilts" that a former slave named Harriet Powers created in the late 1800's. (*See generally* Def.Ex. 56, Regina A. Perry, *Harriet Powers's Bible Quilts* (1994)).

16. "The Life Before" quilt created for the Movie was made from patterns designed by Brown, pursuant to a contract with McCormick and Universal. Brown's patterns are also done in the "folk-art" style, but are materially different from and, therefore, not copies of Powers' designs.

17. The second quilt at issue is the "Where Love Resides" quilt mentioned above. The infringement claims concern only one of the sixteen component blocks of "Where Love Resides." The contested block is generally referred to as the Marriage Block.

18. As pre-production for the Movie proceeded in August 1994, the studio retained McCormick, then President of the Southern California Council of Quilt Guilds, as a technical consultant. (*See* Def.Ex. 48.)

19. Prior to McCormick's involvement, the studio art department, using the descriptions in the script, had attempted to create quilt patterns for the five movie quilts. As McCormick explained at trial, however, the studio artists knew practically nothing about quilts, and their designs proved unsatisfactory. Accordingly, the studio asked McCormick to work with the art department in designing or acquiring the necessary quilts. McCormick also consulted on other technical aspects of the Movie so that the quilting scenes would have an authentic look.

20. McCormick turned her attention to "The Life Before" quilt. Although the studio art department had attempted some designs for this quilt, the designs were off the mark. As McCormick would later relate,

> [t]he art department struggled with ["The Life Before"] quilt. Their only reference was the Smithsonian Museum Bible Quilt by Harriet Powers, and everything they designed looked just like that quilt. These five men in the art department who didn't sew or quilt were also not African–American. This quilt was just not coming together for them, and we didn't have a lot of time.

(McCormick, *Pieces of an American Quilt* 26.)

21. At trial, Brown explained another problem with the designs produced by the art department. The proposed designs for "The Life Before" contained many intricate curves and angles, which would have been very difficult to execute in fabric. Only someone with knowledge of quilt-making can design a pattern that can be effectively translated onto a quilt.

### Brown's Involvement with the Movie Project

22. In September 1994, McCormick became aware of the work of Brown, an African–American quilt designer living in Maryland. McCormick telephoned Brown to propose that Brown design patterns for the fifteen quilt blocks of "The Life Before."

23. McCormick explained in the telephone conversation "that the production team wanted a quilt similar to the style of Harriet Powers' Bible Quilt ... [but] the quilt could not duplicate Powers' Bible Quilts, because they were cultural icons which would be recognized if copied." (Def.Summ.Judg. Motion Ex. C (McCormick Decl. of May 19, 1998 at ¶ 8.))

24. On September 12, 1994, McCormick sent a follow-up letter, reiterating that "[w]hat we are looking for is a design similar to [the Harriet Powers "Bible Quilt,"] but it can't look like the Bible Quilt." (Def.Ex.2.) Although the letter included the pages of the script including the description of "The Life Before" quilt, McCormick referred to the description as "vague." (*Id.*)

25. Brown and McCormick spoke again by telephone the following day. In this conversation, McCormick informed Brown that the studio intended to create two copies of "The Life Before." The production team would "age" the quilts for scenes depicting different eras. Brown informed McCormick that she wanted to retain design rights in her patterns. The price for the fifteen patterns was set at $50 per block, for a total of $750. (Pl.'s testimony.)

26. Three days later, Brown submitted to McCormick the first five quilt block patterns. Brown faxed the patterns divided in fourths, along with directions explaining their reassembly.[3] On the bottom right quarter of each of the complete quilt block patterns, Brown added the notation "© 1994 Barbara Brown." (*See* Def.Ex. 5 & 6.)

27. McCormick took these first few designs to the studio, which "loved" them. (*See* McCormick, *Pieces of an American Quilt* 26.) On September 21, 1994, McCormick called Brown and left an answering machine message; Brown saved the tape. (*See* Pl.Ex. 21.) In the message, McCormick said:

> Barbara, it's Patty McCormick from California ... I presented your designs yesterday to the studio, and they loved them, overwhelmingly approved them, said go ahead, finish them ... follow the script on the blocks that you need and use your best judgment for the others and ... *they approved the fact that you may retain design rights to it* and approved the cost of fifty dollars a block for the design work ... we'll of course

3. Because each quilt block was 16 inches square, the full size patterns could not be faxed on a standard 8.5″ × 11″ sheet of paper.

age this quilt. *One has to ... look like about eighty years old. One has to look like about 110 years old ... or 140 years old.*

(*Id.* (emphasis added).)

28. Some weeks later, McCormick mailed to Brown a letter agreement. (*See* Def.Ex. 4.) The agreement, which McCormick had signed and dated October 1, 1994, stated in part:

As we discussed on the telephone, I will pay you $750.00 to design fifteen 16″ (finished) blocks in the style of African American story quilts, circa 1850. Several blocks are described in the script ... and these descriptions must be replicated in your designs. You may use your own judgement [sic] in creating the remaining blocks to best complete the story. *With your permission, two quilts will be made using your designs* and they will be sold to Universal Studios/Amblin Productions for use in the film, "How To Make An American Quilt." Final design approval of these two quilts will be made by the studio. As we agreed, *you will retain all creative rights to the original designs,* By signing and returning the enclosed copy of this letter, you agree to the terms set forth and give permission to use your designs in this project.

(*Id.* (emphasis added).) Brown signed, dated, and returned the agreement to McCormick.

29. Over the following two months, Brown continued to send the completed quilt block patterns to McCormick using the described method of faxing the quilt block patterns in parts. On each of the patterns, Brown included the notation "© 1994 Barbara Brown."

30. Creation of a quilt pattern is the first of many steps in sewing a quilt. After receiving the patterns, McCormick selected fabrics, which required consideration of weave, texture, material, and color. McCormick then took the selected fabrics and the patterns to a third woman, Dora Simmons, who, with some help from McCormick, assembled the quilt blocks and quilt top. (McCormick testimony.) Fabric selection and assembly are integral steps in the creation of the quilt.

31. In December 1994, after Brown inquired about payment, McCormick called and left a recorded message, which Brown again saved. (Pl.Ex.23.) McCormick explained that the studio would only allow McCormick to bill it for "the finished product." (*Id.*)

32. On March 6, 1995, McCormick mailed Brown a check, along with a thank you letter that noted: "[a]s per our original agreement, the design copyright and ownership of the quilt patterns for 'The Life Before' belong to you; Universal Studios used those patterns with your permission to make the quilt for the movie 'How to Make An American Quilt.'" (Def.Ex.12.)

33. McCormick's thank you letter contained no mention of the "Where Love Resides" quilt or the use of Brown's designs in any quilt other than "The Life Before." (*See id.*)

### Creation of the Marriage Block

34. Movie production continued through the winter and spring of 1995. The studio decided to eliminate one of the flashback scenes involving "The Life Before" quilt. Thus, only one quilt, rather than two, was needed as a prop.

35. In the Movie, each woman in the quilting circle contributed to "Where Love Resides" a block depicting her own life story. McCormick and the studio production department designed the patterns for the blocks. McCormick chose the fabric, arranged the blocks as they would appear on the finished quilt, and did much of the sewing. This litigation involves only one of the blocks, the Marriage Block.

36. In the Movie, one of the quilters, Anna (played by Maya Angelou), was an African–American who owned "The Life Before" quilt as a family heirloom. In designing Anna's block, the Marriage Block, McCormick borrowed the basic design of the Wedding Block in "The Life

Before." By doing so, McCormick linked the two quilts thematically and created a fitting block for Anna. McCormick, however, did not obtain Brown's permission to use Brown's design in another quilt. McCormick, who has no legal training, did not appreciate that she had created a copyright problem. Pursuant to its contract with McCormick, Universal expressly relied upon McCormick to obtain the necessary authorizations for any patterns that the production team did not itself make. Indeed, Lawrence Weir, Universal's Director of Feature Production Services, asked the production team whether releases were necessary for the "Where Love Resides" quilt. The production team informed Weir that it was creating the entire quilt so that no releases were needed. (Weir testimony.)

37. The studio needed both finished and unfinished versions of the "Where Love Resides" quilt. Thus, McCormick created two quilt tops including the Marriage Block. (See Def.Summ.Judg. Motion Ex. C (McCormick Decl. of May 19, 1998 at ¶ 15).)

38. Both the Marriage Block and the Wedding Block depict "a scene with a black bird flying over a man and a woman holding hands." (See McCormick, *Pieces of an American Quilt* 20; Def.Ex. 130.)

39. The Harriet Powers "Bible Quilts" also included blocks depicting two human figures with a large bird overhead.

40. The Marriage Block differs from the Wedding Block in two major respects: (i) in the Marriage Block, the crow points downward rather than upward; and (ii) the Marriage Block includes a figure of the sun not present in the Wedding Block. With these exceptions, however, the Marriage Block is plainly derivative of the Wedding Block.

41. McCormick consulted the Wedding Block before designing the Marriage Block. In her declaration prepared for summary judgment, McCormick states:

> The concept of the Marriage Block, with a man and woman holding hands, a crow and a stylized sun, was created without any input from Plaintiff, before Plaintiff faxed any designs to me. When I joined the production team in August 1994 the production team had viewed pictures of Powers' [s] quilts and had already drawn several versions of the Marriage Block which were on display ... I viewed the production team's drawings of the Marriage Block, and I consulted those drawings in the preparation of the Marriage Block.
>
> ... I incorporated the elements and style from the block in "The Life Before" quilt, but updated the expression because it was being incorporated into a 20th Century quilt. *In creating the Marriage Block I consulted the plaintiff's pattern for the wedding block in "The Life Before" quilt,* as well as the patterns for the Marriage Block prepared by the production team. I also consulted more modern folk art sources.

(Def.Summ.Judg. Motion Ex. C (McCormick Decl. of May 19, 1998 at ¶¶ 6 & 13 (emphasis added)).) McCormick's testimony at trial was substantially similar.

42. McCormick wrote a book, titled *Pieces of an American Quilt.* In it, McCormick flatly states that the Marriage Block is a "duplication" of the Wedding Block:

> The next friendship block is made by Anna, the character Dr. Maya Angelou portrays. *I made this block using the pattern Barbara Brown had designed for the Marriage block in The Life Before quilt.* Anna owns the family heirloom quilt given to her by her Aunt Pauline, which tells the story of her family and how her grandparents met. *The block in this quilt is a duplication of the Marriage block in The Life Before quilt.*

(Def.Ex. 43; *Pieces of an American Quilt* 20 (emphasis added).)

43. *Pieces of an American Quilt* contains a photograph of the Marriage Block. The caption below the photograph states that the Marriage Block was *"designed by*

*Barbara Brown."* (*Id.* at 21 (emphasis added).)

44. From the above evidence and a physical examination of the two designs, the Court finds that the Marriage Block is substantially similar to the Wedding Block. The Court also finds that McCormick created the Marriage Block by copying the essential design of the Wedding Block.

45. The human and animal figures shown in the two blocks are essentially identical. While the fabrics used are different, the two blocks obviously share a common origin.

46. Brown first learned in a telephone conversation with McCormick on June 29, 1995, that McCormick had used Brown's design of the Wedding Block in the design of the Marriage Block.

### Premiere of the Movie and its Financial Results

47. The Movie opened to the general public in the United States on October 6, 1995.

48. Throughout the United States, including the State of Maryland, the Movie was advertised in newspapers and on television and distributed for viewing at movie theaters and, subsequent to its theatrical release, on cable television.

49. Universal Studios released the home video of the movie, *How to Make an American Quilt,* in April 1996.

50. As of September 26, 1998, Universal had received $29,117,120 in gross revenue from the display of *How to Make an American Quilt* in theatres, on videocassettes, and on cable television, both domestically and abroad. (Def.Ex.66.)

51. Also as of September 26, 1998, Universal had incurred $28,836,827 in distribution expenses and $29,620,190 in production costs for *How to Make an American Quilt.* (*Id.*) Thus, Universal's total cost of more than $ 50 million substantially exceeded its revenue. Accordingly, the

Court finds that the Movie produced no profits for Universal.[4]

52. Amblin received a fee of $2,000,000 for its services producing the movie, *How to Make an American Quilt.* (*See* Stipulation No. 1.)

### Merchandising Efforts

53. In the summer months of 1995, with the Movie set to open in theaters in early October, the studio's consumer products division, MCA/Universal Merchandising, Inc. began licensing rights for movie tie-in items.

54. On July 20, 1995, Universal Merchandising signed a merchandising representation agreement with defendant Marketing and Financial Management Enterprises, Inc. ("M & FM"). M & FM agreed to solicit and supervise merchandising license agreements for the Movie. (Def.Ex.13.)

55. The allegations in the complaint relate to three merchandising/promotional efforts in particular: (i) a book produced by Defendant Patchwork, (ii) an art print produced by Defendant Greenwich, and (iii) promotional t-shirts and tote bags produced by Defendants Universal and M & FM.

#### (i) Where Love Resides

56. On November 8, 1995 Patchwork and Universal Merchandising signed an agreement (retroactive to October 24, 1995) licensing Patchwork to produce an inspirational style book, entitled *Where Love Resides: Reflections on Love and Life.* (*See* Def.Ex. 29.)

57. The book contained "stills" and quotations from the Movie as well as photographs of several of the movie quilts. Counts XI–XIV are based on the inclusion of several photographs of the Marriage Block, both by itself and as part of the "Where Love Resides" quilt. (*Id.*)

---

**4.** At trial, Brown sought to dispute certain of the categories listed on the accounting statement produced by Universal. Even had the Court accepted the points raised by Brown, the disputed figures would not affect the finding that Universal lost substantial money on the Movie.

58. In January 1996, Mimi Dietrich of Catonsville, Maryland notified Patchwork that Barbara Brown objected to the inclusion of photographs of her quilt block designs in the *Where Love Resides* book. (*See* Def.Ex. 84.)

59. Patchwork immediately contacted Universal and received assurances that it could safely proceed with publication. Universal represented that it would resolve the dispute as to who held the copyrights to the quilts used in the Movie. (*See* Def.Ex. 35.)

60. Patchwork printed an initial run of 50,000 copies of the *Where Love Resides* book. The book did not sell well and lost money ($209,976) for Patchwork. (*See* Def.Ex. 65.)

61. Under the licensing agreement, Universal Merchandising was to receive an advance fee of $30,000 from Patchwork, with a guarantee of $60,000. (*See* Def.Ex. 29 at 2.)

62. Neither Brown's name nor the names of any of the quilters who designed and made quilts for the Movie were credited in the *Where Love Resides* book.

63. *Where Love Resides* contains photographs of quilts created from Brown's copyrighted patterns. Brown's work is clearly recognizable and forms a significant part of the book.

### (ii) Greenwich Painting

64. As of April 4, 1995, Greenwich had already entered into a merchandising license agreement with Universal. Under the terms of the agreement, Greenwich was licensed to produce an original painting, to be created by artist John Simpkins. From the painting, Greenwich was to make and market a limited edition of reproductions. (Def.Ex.15.)

65. In May 1995, Greenwich entered into an agreement with Simpkins. Counts XVI–XIX of the amended complaint relate to the creation of Simpkins's original painting and the limited edition reproductions.

66. The painting was to "symbolize" the Movie. Before starting work, Simpkins read Otto's novel and the movie script; he also watched the Movie. Greenwich instructed Simpkins that the quilt pictured in the painting had to evoke the Movie and its quilts.

67. In the painting, a small rendition of the "Where Love Resides" quilt occupies the center of the composition. At the top of the print is a large house set against a background of sky and mountains. At the bottom is a white picket fence and a road on which a van is parked. Surrounding the quilt is a green lawn, with four apple trees. In relation to these compositional elements, the quilt is of minor importance.

68. As depicted in the print, the quilt's blocks are difficult to see individually. Each block is only a square inch in size. Thus, the Marriage Block is recognizable only upon close examination.

69. Simpkins shipped the completed painting to Greenwich in August 1995, and the limited edition reproductions based on the painting were printed and first offered for sale in September 1995.

70. Greenwich advertised 2,000 copies of the print. The first 1,000 copies, called the Premiere Edition, were priced at $ 450 a piece. These copies were numbered, and signed by the artist as well as the film's director, producer, and stars. (Meskill testimony.) Greenwich offered the second 1,000 copies, the Studio Edition, for $ 225.00 each. The Studio Edition prints were numbered and signed only by the artist.

71. Greenwich advertised the limited edition art prints in a national magazine. The advertisement included a photograph of the print. (*See* Pl.Ex. 58.)

72. Greenwich continues to offer for sale the *Where Love Resides* art print. Out of 2,000 prints produced, fewer than 200 had been sold as of May 1999. (*See* Def.Ex. 45 and Meskill testimony.)

73. As of September 10, 1997, Greenwich had received $27,787.50 in gross revenue from sales of the art print and incurred $92,734.51 in expenses. Fewer

than ten prints have been sold since that date. Greenwich has not and will never earn a profit on the art print project.

74. Greenwich paid Universal $15,000 as a license fee in return for permission to create and sell the original Simpkins painting and the prints made from it. (*See* Def.Ex. 15.)

75. As of May 31, 1997, Simpkins had received an $11,000 commission on the sale of the *Where Love Resides* painting and $4,168.51 in royalties for sales of the *Where Love Resides* art prints. (*See* Def. Ex. 16.)

76. The Court finds that the Marriage Block is a *de minimis* part of the fine art print.

### (iii) Houston Festival and Promotional Items

77. In early November 1995, McCormick attended the International Quilt Festival in Houston, Texas, and worked in M & FM's exhibit booth, at which M & FM displayed both the finished and unfinished copies of the "Where Love Resides" quilt. The two "Where Love Resides" quilts and "The Life Before" quilt were displayed in Houston, Texas with the permission of Universal Merchandising.

78. As giveaways to promote the movie, Universal Pictures created and distributed t-shirts and tote bags depicting the "Where Love Resides" quilt. (*See* Pl.Ex. 91, 91, & 190; Siuta Testimony.)

79. The t-shirts and tote bags were given away and not sold. Accordingly, no profit was produced. Universal and M & FM spent money producing the t-shirts and tote bags just as they spent money advertising the Movie.

### Initial Disputes over Intellectual Property Rights

80. As discussed, Universal entered into written contracts with McCormick, Brown, and the nonparty quilters. Universal was under the impression that it had obtained all necessary releases for use of the quilts in the Movie, promotional items, and tie-in items. Ideally, the con-

tracts and releases would have clearly delineated all intellectual property rights with respect to the quilts and the quilt designs. Unfortunately, the contracts were unsuccessful in forestalling a series of disputes and misunderstandings that centered primarily on the tie-in projects.

81. In addition to the tie-ins heretofore described, McCormick proposed to write a book, *Pieces of an American Quilt,* detailing her experiences working as a technical consultant on the Movie. Under McCormick's contract, Universal's permission was explicitly required, and Universal initially refused. McCormick countered by asserting that (i) Universal's permission was not required to publish the book, (ii) Universal required the permission of McCormick, Brown, and the nonparty quilters to publish Patchwork's book, *Where Love Resides,* and (iii) McCormick threatened to withhold permission for Patchwork's book unless Universal sanctioned her book. (*See* Def.Ex. 111.)

82. To research McCormick's contentions, Michelle Katz, the Vice President of the General Counsel of Universal Merchandising, wrote a series of letters to Brown, McCormick and the nonparty quilters in January 1996 to determine which individuals held the intellectual property rights in the quilts and quilt designs. (*See* Def.Ex. 35–38.) Rather than clarifying the rights at issue, Katz unearthed a welter of conflicting claims and demands, many of which persisted through the trial.

83. Brown contended that she held the copyrights to the designs used in "The Life Before" quilt and in the Marriage Block. In fact, on January 16, 1996, Brown filed a copyright registration application for her quilt block patterns. (*See* Def.Ex. 140.)

84. McCormick disputed Brown's rights and contended that she held the copyrights to "The Life Before" and the "Where Love Resides" quilts. McCormick filed copyright registration applications for both quilts on January 11, 1996. (*See* Def. Ex. 25 & 26.)

85. In March 1996, McCormick entered an agreement with Universal Merchandising allowing her to publish *Pieces of an American Quilt*. In exchange, McCormick released all of her rights in connection with the publication of *Where Love Resides*. (*See* Def.Ex. 91.) Universal, however, did not obtain a separate release from Brown.

86. In February 1996, Brown entered an agreement with McCormick's publisher, C & T Publishing, authorizing C & T to use photographs of "The Life Before" and the Marriage Block in *Pieces of an American Quilt*. In exchange, Brown received a royalty and an advertisement for her patterns. (*See* Def.Ex. 41.) McCormick also obtained releases from the nonparty quilters.

87. Although Brown and McCormick resolved their differences over *Pieces of an American Quilt*, disputes concerning McCormick's efforts to publicize the book persisted. In June 1996, Brown corresponded with McCormick, demanding that McCormick cease displaying "The Life Before" and the "Where Love Resides" quilts at craft shows and in advertisements for *Pieces of an American Quilt*. Brown sent a copy of her demand letter to Universal Merchandising.

88. Because McCormick received permission from Brown to display in the book the quilts created from Brown's patterns, McCormick believed she was entitled to publicize the book. In addition, McCormick considered herself a joint creator. McCormick therefore refused to comply with Brown's demands.

89. During the summer and fall of 1996, McCormick conducted a publicity tour for her book, which included an appearance on a cable program, "Handmade by Design," and a cable quilting program, "Simply Quilts." While on these cable programs, McCormick displayed and discussed "The Life Before." These appearances are the subject of Count XX of the amended complaint.

90. Amblin had custody of and owned the quilts. When McCormick wanted to display the quilts, she obtained them from Jerry Schmitz of Amblin. (McCormick testimony.)

91. When the parties were unable to resolve the outstanding disputes as to the rights to the movie quilts, the present litigation ensued in November 1996.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

2. To establish a claim for copyright infringement, a plaintiff must demonstrate (i) ownership of a valid copyright, and (ii) copying of the "original" elements of the work. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

3. A certificate of copyright registration constitutes prima facie evidence of the validity of the certificate and the facts stated in the certificate. *See M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir.1986). In this case, Brown registered a copyright for the fifteen quilt block patterns constituting "The Life Before" quilt in January 1996. (*See* Def.Ex. 140.) The Court concludes that Brown's designs were copyrightable.

4. To be subject to copyright, a work must be "original." 17 U.S.C. § 102(a); *see Feist*, 499 U.S. at 345–47, 111 S.Ct. 1282. As the Supreme Court stated in *Feist*:

> The *sina qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might

be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

*Feist,* 499 U.S. at 345, 111 S.Ct. 1282 (citations omitted).

5. On this standard, the Court finds that Brown's designs are "original" and therefore subject to copyright. Brown created the designs herself; although the script gave descriptions of some of the elements for the designs, these descriptions were "vague," and McCormick instructed Brown to use her own judgment in creating the actual designs. Furthermore, McCormick repeatedly cautioned Brown not to create copies of the Harriet Powers "Bible Quilts"; for the studio's purposes, Brown's designs needed to be, in a word, original.

6. To establish unauthorized copying, a plaintiff must establish copying in fact and "substantial similarity" between the copy and the plaintiff's original. *See, e.g., Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 74–75 (2d Cir.1997).

7. In practice, however, these two elements frequently merge, because a plaintiff may establish copying in fact either: (i) by providing direct evidence of copying; or (ii) by providing circumstantial evidence of copying that demonstrates the defendants' access to her work and "substantial similarity" between the works. *Ferguson v. NBC,* 584 F.2d 111, 113 (5th Cir.1978).

8. Regarding the Marriage Block in "Where Love Resides," Brown has established that Universal and McCormick copied her design for the Wedding Block. McCormick herself admits in *Pieces of an American Quilt* that the design for the Marriage Block in "Where Love Resides" is Brown's design and that McCormick copied the Wedding Block when creating the Marriage Block.

9. McCormick's testimony further bolsters the conclusion that she copied "original" material from Brown's designs;

McCormick made a point of noting in her narrative how unsatisfactory earlier attempts at a design for this block had been, notwithstanding the availability of the "Bible Quilts" and other designs. It was only after McCormick consulted Brown's Wedding Block that she achieved a satisfactory design for the Marriage Block.

10. As described earlier, the idea of two figures with a bird flying overhead is not copyrightable. A particular and distinctive expression of that idea, as was created by Brown for the Wedding Block, however, can be copyrighted. Rather than asking Brown to create a separate Wedding Block for inclusion in "Where Love Resides," McCormick appropriated Brown's design without authorization or additional compensation.

11. From this evidence and from an examination of the two blocks, the Court concludes that the design of the Marriage Block resulted from copying the original elements in the Wedding Block from "The Life Before."

12. Whether a defendant's work is substantially similar to a plaintiff's work and infringes a copyright depends upon similarity of expression rather than similarity of idea; the latter is not protected by copyright law. 17 U.S.C. § 102(b).

13. A defendant's work is "substantially similar" to a protected work when an ordinary observer would conclude that the defendant's work was taken from the copyrighted source. *Robert R. Jones Assoc., Inc. v. Nino Homes,* 686 F.Supp. 160 (E.D.Mich.1987), *aff'd,* 858 F.2d 274 (6th Cir.1988). Thus, expert testimony is not required. *Testa v. Janssen,* 492 F.Supp. 198 (W.D.Pa.1980).

14. This test focuses on the overall similarities, *rather than the minute differences between the two works,* and exact reproduction or near identity is not required to establish infringement. *Atari, Inc. v. North. Am. Philips Consumer Elec. Corp.,* 672 F.2d 607, 618 (7th Cir.), *cert.*

*denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

15. McCormick reversed the alignment of the crow and added a sun. These differences, however, do not affect the conclusion that McCormick copied the majority of the Marriage Block from Brown's copyrighted design.

16. Brown has established copyright infringement of her Wedding Block design by both direct and circumstantial evidence.

**Defenses Raised Do Not Excuse Infringement**

17. That some of the elements in Brown's design resemble the "Bible Quilts" or other artistic works in the public domain does not undermine Brown's copyright registration.

18. Defendants argue that the contract language permitted them to use the Wedding Block in two quilts. The contract states: "with your permission, two quilts will be made using your designs...." According to the defendants, this language permitted them to use the Wedding Block in "The Life Before" and in "Where Love Resides." (*See* Def.Ex. 4.)

19. The defendants' argument hinges on the legal effect of the language quoted immediately above. According to the defendants, the contract is clear, meaning that parole evidence is inadmissable and that Universal was free to create any two quilts they wished using all, part, or none of Brown's designs.

20. Brown disputes this interpretation. According to Brown, the contract entitled Universal to make two copies of "The Life Before." As explained by McCormick, two quilts were needed because one would appear new and the other would be aged to appear more than 100 years old.

■ 21. The Court finds that the contract language is ambiguous. When contract language is ambiguous, meaning that it is susceptible to different reasonable interpretations, it is for the trier of fact to determine the proper interpretation. *See, e.g., Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202, 208, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995).

■ 22. Weighing the testimony of Brown and McCormick, together with the evidence, the Court accepts Brown's interpretation. It is clear that the term "two quilts" refers to the two copies of "The Life Before" to be used in different flashback scenes in the Movie. The agreement permitted Universal to make two copies of "The Life Before"; it did not authorize Universal to use Brown's designs in two different quilts.[5]

■ 23. The defendants argue, in the alternative, that their participation in the creation of the quilts places them, and other non-parties who worked on the quilts, in the position of joint authors with Brown.

24. This argument was extensively addressed in the Court's summary judgment memorandum. *See Brown v. McCormick,* 23 F.Supp.2d 594 (D.Md.1998). The Court adopts the reasoning stated in that opinion.

25. The agreement with Brown specifically gave permission for the Wedding Block to be used in two quilts of "The Life Before." The agreement contemplated that Brown would contribute the patterns and that others would assemble the quilt. The defendants' argument would in effect nullify the contract by permitting McCormick and Dora Simmons, as joint authors, to license the designs to others. Such an interpretation is clearly wrong. The defendants were permitted to use the patterns solely for the specific purpose stated in the contract; to wit, two copies of "The Life Before." Any other use required Brown's permission.

---

**5.** This factual dispute is not close. The defendants' interpretation of the agreement is strained and unnatural. In addition, Defendants' interpretation clearly contradicts the conversations between McCormick and Brown conducted over the telephone and through letters.

26. Further, with regard to the Marriage Block, the defendants' argument is utterly without merit. The statute states that "[a] 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Brown had no knowledge that her work was to be copied to form the basis for the Marriage Block. Accordingly, it is impossible that Brown intended her work to be merged into a greater composition and she cannot be considered to be a joint author along with the other contributors to "Where Love Resides."

27. The Court finds that the defendants are not joint authors with respect to the Marriage Block or "The Life Before." They are, therefore, liable for infringement of Brown's copyright through those two works.

28. The Court will now turn to Brown's specific allegations of copyright infringement as set forth in the amended complaint.

### a. Counts I and II

Count I alleges that McCormick infringed Brown's Wedding Block design through the creation of the Marriage Block for "Where Love Resides." The Court finds that McCormick is liable for this infringement. Count II is an alternative source of relief for Brown if she did not prevail in Count I. Count II alleges that McCormick used Brown's design more times than Brown had given permission. Count II is, therefore, duplicative, and will be dismissed as moot.

### b. Count III

■ Count III alleges that McCormick infringed all of Brown's designs by displaying "The Life Before" and "Where Love Resides" at exhibitions. Brown gave permission solely for the use of the patterns for "The Life Before" in the Movie. This permission extended to the use of "The Life Before" for promotional and marketing purposes; it did not, however, extend to McCormick's private use of the quilt at exhibitions. The Court, therefore, finds McCormick liable under this count with respect to "The Life Before." As the Court previously stated, "Where Love Resides" incorporates Brown's copyrighted Wedding Block. Any display of "Where Love Resides" is an infringement. Thus, the Court finds McCormick finds liable for the display of "Where Love Resides" at the exhibitions.

### c. Counts IX and X

■ Counts IX and X allege that Universal, M & FM, and McCormick infringed Brown's Wedding Block by imprinting "Where Love Resides" on t-shirts and tote bags distributed to promote the Movie. Because the Court finds that Defendants infringed Brown's Wedding Block through the display of the "Where Love Resides" quilt in the Movie, the Court also finds the defendants liable for the display of "Where Love Resides" on promotional items.

### d. Counts XI–XIV

■ Counts XI–XIV allege that Universal, M & FM, and Patchwork infringed all of Brown's designs though display of the two quilts in the *Where Love Resides* book. The Court finds that the book was not a promotion for the Movie. Because Brown gave permission for the use of her patterns solely in the Movie, the display in the book, of quilts based on Brown's patterns, was not licensed. The Court, therefore, finds these defendants liable under Counts XI–XIV.

### e. Counts XVI–XIX

■ Counts XVI–XIX allege that MCA, M & FM, Greenwich, and Simpkins infringed Brown's Wedding Block design through the rendering of "Where Love Resides" in the original Simpkins painting and in the Greenwich print. As discussed above, the Marriage Block constitutes a *de minimis* fraction of both works; it is recognizable only upon close inspection. Accordingly, the Court finds that these de-

fendants did not infringe Brown's Wedding Block in the creation of the painting and the print. Similarly, the Court finds that the advertisements showing a picture of the print did not infringe Brown's Wedding Block. The defendants are, therefore, not liable under these counts.

### f. Count XX

Count XX alleges that McCormick infringed all of Brown's designs by displaying "The Life Before" and "Where Love Resides" on cable television programs. Similar to the Court's finding as to Count III, the Court finds that Brown's permission for use of the patterns did not extend to McCormick's private use of the quilts on cable television programs. The Court therefore finds McCormick liable under this count.

### g. Counts XXIV–XXV

Counts XXIV–XXV allege that Universal and Amblin infringed Brown's Wedding Block through the display of "Where Love Resides" in the Movie. As discussed, the Court finds that Universal and Amblin infringed Brown's Wedding Block. Universal and Amblin are, therefore, liable to Brown for her share of any profits derived from use of the block in the Movie.

### *Defendants' Infringement was not Willful*

■ 29. The Court finds that none of the infringements committed by any of the defendants was willful. A determination of willfulness requires the infringer to have acted with actual "knowledge that his conduct constituted infringement or ... reckless disregard for the owner's rights." *Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1091 (D.Md.1995); *see also N.A.S Import, Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir. 1992).

30. Brown produced some evidence that she characterized as demonstrating willful violations by McCormick. Each pattern that McCormick received from

Brown was clearly marked with the notation "© 1994 Barbara Brown." In the very letter agreement that she drafted, McCormick acknowledged that Brown retained the creative rights to her patterns. Brown alleges that McCormick ignored all of Brown's warning letters and continued to display publicly the disputed Marriage Block even after suit was filed. As a non-lawyer, however, McCormick did not understand the complexity of copyright law.

31. Brown also argues that Universal, Amblin, Greenwich, and Simpkins did not, upon receiving Brown's demand letter of January 1996, voluntarily stop their infringement. Instead, they proceeded with the distribution and sale of the infringing *Where Love Resides* book.

32. The Court finds that the defendants were careless in their use of Brown's designs, but not willful. Throughout production of the Movie, Universal diligently sought to ensure that all of the copyright bases were covered. In the flurry of production, however, Universal delegated to McCormick, a non-lawyer, the task of securing permission from Brown to use Brown's patterns. Universal's regular practice was to secure a complete release of artistic rights from prop makers such as Brown. (Weir testimony.) The contract drafted by McCormick, however, effected only an ambiguous and limited release, which created legitimate confusion as to Universal's rights. (*See* Def.Ex. 35–38.) In contrast to those cases in which courts have found willful infringements, the defendants here do not have a track record of intentionally infringing others' works. *See, e.g., Religious Technology Center v. Lerma*, 40 U.S.P.Q.2d 1569, 1581 (E.D.Va. 1996); *Microsoft Corp.*, 910 F.Supp. at 1091; *Dae Han Video Production, Inc. v. Chun*, 1990 WL 265976, 17 U.S.P.Q.2d 1306, 1313 (E.D.Va.1990). Had Universal obtained the releases from Brown itself, rather than relying on McCormick, this entire litigation would have been avoided.[6]

---

**6.** As was its practice, Universal's legal department would have foreseen the ancillary uses

of Brown's copyrighted patterns, and provided for those uses as well.

Universal is guilty of sloppiness, but not willful infringement.

33. Having found that some infringement did occur, the Court now turns to the appropriate damages.

### a. Counts I–II

The Court found McCormick liable for the infringement alleged in Count I. The Court awards to Brown in actual damages $50, which is the amount she would have received for creating an additional pattern. Because McCormick did not earn any profits for the Marriage Block, there are no profits to share. The Court will grant judgment in McCormick's favor as to Count II, which is duplicative.

### b. Count III

The Court found McCormick liable for the infringement alleged in Count III. Because Brown did not suffer actual damages and McCormick did not earn any profits from McCormick's display of "Where Love Resides" at exhibitions, the Court awards nominal damages of $1.

### c. Counts IX & X

The Court found the defendants liable for the infringement alleged in Counts IX and X. Because Brown did not suffer actual damages and Defendants did not earn any profits from the merchandising of the Movie, the Court does not award Brown any damages for this infringement. The Court further finds that statutory damages are not available for this infringement.

### d. Counts XI–XIV

The Court found Defendants Universal Merchandising, M & FM, and Patchwork liable for the infringing Where Love Resides book. For this copyright infringement, Brown has elected to recover statutory damages. The Court awards Brown statutory damages in the amount $500 per infringement of each of Brown's 14 copyrighted patterns,[7] for a total of $7000.

### e. Counts XVI–XIX

The Court found that the Where Love Resides painting and fine art prints do not infringe Brown's copyright. Accordingly, judgment will be entered in favor of the defendants on Counts XVI–XIX of the amended complaint.

### f. Count XX

The Court found McCormick liable for McCormick's unauthorized display of the "The Life Before" on cable television programs. For these instances of copyright infringement, Brown has elected to recover statutory damages. The Court awards Brown statutory damages in the amount of $7000, or $500 for each of the 14 patterns infringed.

### g. Counts XXIV–XXV

As described above, Brown is entitled to an allocated share of any profits earned by the defendants for use of the Marriage Block in the Movie. Universal lost money on the Movie, so there are no profits to share. Amblin received a production fee of $2 million, which the Court finds to be the appropriate measure from which to calculate Brown's damages. The defendants' expert testified that the value of Brown's contribution to the Movie through the Marriage Block was .0001176% of the total value of the Movie. (See Def.Ex. 67 at 13.) The Court accepts this testimony and awards Brown .0001176% of Amblin's $2 million in profits, or $2.35.

### Conclusion

By creating and displaying the Marriage Block, Defendants infringed Brown's copyrighted designs. Further, Defendants should have obtained Brown's authorization prior to displaying "The Life Before" for purposes not directly related to the Movie. Because Defendants' actions did not constitute willful infringements, howev-

---

7. Brown is not entitled to statutory damages for infringement of the Wedding Block in "The Life Before." See 17 U.S.C. § 412. Statutory damages is therefore appropriate solely for the fourteen remaining blocks of "The Life Before."

er, Brown's award amount is limited to actual and statutory damages.